**Walter HILDEBRAND, Libelant,**

v.

**UNITED STATES of America,
Respondent.**

United States District Court
S. D. New York.

Aug. 26, 1954.

Sterling & Schwartz, New York City, Proctors for libelant.

J. Edward Lumbard, Jr., U. S. Atty., New York City, Proctor for respondent, Arthur M. Boal, Tompkins, Boal & Tompkins, New York City, of counsel.

DAWSON, District Judge.

This is an action by the libelant, a seaman, for damages because of injuries received by him when, in descending into the hold of the S.S. Casimir Pulaski on or about March 7, 1952, the rung on a ladder gave way, causing him to fall some twenty-five feet into the bottom of the hold and suffer substantial personal injuries. There is no dispute that the ship was owned by the United States of America and operated pursuant to the usual General Agency Agreement by Eastern Steamship Lines, Incorporated.

### 1. The Issue As To Liability

The facts upon which the issue of liability is asserted and denied are not substantially in dispute. They are, and are found by me to be:

(a) The libelant was, on March 7, 1952, the Third Mate on the S.S. Casimir Pulaski (hereinafter called the "ship").

(b) On or immediately before March 7, 1952, the ship was docked at Trieste, Italy, and engaged in the discharge of coal from the holds of the ship; and such coal was being discharged by stevedores using clam shell buckets and shore cranes.

(c) In the early morning of March 7, 1952, in the course of unloading the coal, damage was done to the forward ladder in hold No. 3. In the log of the ship, there appears the notation made by an officer of the ship, which stated:

"Resumed disch. No. 3 and found 2 broken rungs and damage to ladder No. 3 hold forward."

(d) Before starting his watch at 4:00 P. M. on March 7, 1952, the libelant knew from examining the foregoing statement in the log book and also from personal observation that two rungs were missing from that part of the forward ladder in No. 3 hold which ran from the 'tween-deck to the lower hold. His observation did not indicate any other damage to the ladder.

(e) The libelant went on watch at about 4:00 P. M. on March 7, 1952; his watch lasted from 4:00 P. M. to midnight. During this period of time, he was the only deck officer on duty.

(f) At about 11:00 P. M. on March 7, 1952, the libelant asked the Chief Engineer to turn the steam on the deck lines because the temperature was down to freezing point. The Chief Engineer turned on the steam. The libelant, who had returned to the deck, noticed steam pouring out of No. 3 hold and that stevedores who had been working in the hold were hurrying to get out of the hold.

Libelant thereupon went to the engine room and told the Chief Engineer to turn off the steam because it was escaping into No. 3 hold. The steam was turned off.

■ (g) The libelant returned to the deck and upon reaching the location of No. 3 hold, decided to go into the hold to investigate where the steam was coming from, what had caused it to escape, and whether any stevedores had been scalded and were still in the hold or whether any damage had been done. Since libelant was the only deck officer on duty at that time on the ship, I believe that it was properly within the scope of his duties and responsibilities to make such investigation.

(h) There were three ladders which led from the deck into No. 3 hold. One was a ladder which went through the ventilator trunk to the lower hold. This ladder, being enclosed, was in darkness, and the use of this ladder would have necessitated the use of a flashlight. The libelant did not have a flashlight with him, but did have one in his room on the ship. This ladder was not customarily used except when the hold was full of cargo. The second ladder was the aft ladder into the hold. It was not customarily used because of the fact that to approach the ladder it was necessary to traverse a space between the midship house and the coaming where the aft ladder was located, and this space was only eighteen inches wide. The third ladder was the forward ladder in No. 3 hold. This ladder ran from the deck to the 'tweendeck, and then from the 'tweendeck to the bottom of the hold.

(i) Stevedores entered and left the hold by means of that ladder on March 7, 1952 after the damage had been done to the ladder and before libelant was injured; and the mate who preceded libelant on duty entered and left No. 3 hold by means of that ladder. Libelant had also observed stevedores using this forward ladder in No. 3 hold to escape from the hold when the steam escaped into that hold.

(j) Libelant descended into No. 3 hold using the forward ladder. He knew that two of the upper rungs on that part of the ladder between the 'tweendecks and the bottom of the hold were missing. Therefore, in going from the 'tweendeck to the lower hold, he first put his hands on the bottom rung of the ladder from the main deck to the 'tweendeck and his foot on the upper remaining rung of the ladder from the 'tweendeck to the lower hold, which was below the space left by the two missing rungs. Libelant then reached down and put his hands on this first upper rung and put one foot on the rung below that. When he was in this position, with two hands and one foot on this rung, it pulled out and he fell backward into the hold, a distance of about twenty-five feet.

We have, in this case, therefore, a situation where the injuries suffered by the libelant were caused by a rung pulling out of a ladder. The libelant knew that the ladder had theretofore been damaged by having two rungs knocked out, which rungs were immediately above the rung that came out at the time the libelant put his weight on it.

The respondent urges that this evidence shows no negligence on its part, and that there was no breach of a warranty of seaworthiness; and that, in fact, the warranty of seaworthiness is not pleaded.

I cannot agree that unseaworthiness has not been pleaded.

■ Originally, maritime law provided a seaman only with a remedy for unseaworthiness, a remedy for negligence being denied. The Osceola, 1903, 189 U. S. 158, 23 S.Ct. 483, 47 L.Ed. 760. Subsequently, Congress, Jones Act, 46 U.S. C.A. § 688, gave a seaman either of these remedies in the alternative. Both may be pleaded in the same complaint, without election. Balado v. Lykes Bros. S. S. Co., Inc., 2 Cir., 1950, 179 F.2d 943.

■ Paragraph Fourth of the libel alleges that the respondent had a duty "to provide libelant with a safe and seaworthy ship; and to warn the libelant of the dangers to be encountered in the performance of the said work." Paragraph Fifth alleges that the injuries to

libelant were caused by the "negligence" of respondent and "in violation of the aforesaid duty and obligation". This, it seems to me, is sufficient to raise the issue of seaworthiness.

■ There could be little doubt that if a rung pulled out of an ordinary ladder on a ship, and as a result, a seaman was injured, he would have a right to recover on the ground that his employer had not furnished him a safe and seaworthy place in which to work. See Mahnich v. Southern S. S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561. This is a species of "liability without fault * * * neither limited by conceptions of negligence nor contractual in character." Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 877, 90 L.Ed. 1099.

Here, we have a situation where the ladder had previously been damaged by having two rungs knocked out of it, and libelant knew that fact. Does this mean that libelant thereafter used that ladder at his peril and if some other rung pulled out when he put his entire weight on it, that he cannot recover because the warranty of seaworthiness no longer applied to that ladder or any part of it?

■ To so conclude would be to decide that where any damage has been done to any part of a ship, a seaman would assume the risk of using that part. But assumption of risk is not recognized as a defense to a claim based on unseaworthiness even in this situation. Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265. The most that could be contended would be that the libelant was guilty of contributory negligence. See the excellent discussion of this problem in a somewhat similar situation in Dixon v. United States, D.C.S.D.N.Y., 1954, 120 F.Supp. 747, Opinion by Weinfeld, D. J.

In this case, the ladder had not been withdrawn from use. It continued to be used by the stevedores in entering and leaving the hold.

The respondent by inaction held out the ladder (with the exception of the two missing rungs) as fit for use. It was used as an integral part of the ship. The situation might perhaps have been different if respondent had taken the ladder out of use by barring access to it, or if the person who was injured had been hired to repair it, knowing it to be in a defective condition. Byars v. Moore-McCormack Lines, Inc., 2 Cir., 1946, 155 F.2d 587. Where, however, the ladder was allowed to remain in use by the seamen and was used and was not in the process of being repaired, it cannot be concluded that libelant was compelled to assume the risk that the entire ladder—other than the admittedly two missing rungs—was defective, and that the ladder in its entirety was no longer covered by the warranty of seaworthiness.

■ I conclude that as a matter of law the libelant did not assume the risk that the ladder, other than the missing rungs, was unseaworthy. And, as previously indicated, the injuries resulted from a defect in the ladder other than the two missing rungs.

■ There remains the question as to whether libelant was guilty of contributory negligence. Contributory negligence is not a defense to this type of action, but it may be used to mitigate damages. Respondent asserts that libelant was contributorily negligent because he used the forward ladder in hold No. 3 rather than going down the ladder in the ventilator trunk or using the aft ladder. Respondent urges that libelant knew that there had been some damage done to the forward ladder, and that when he chose to go down that ladder, rather than either of the other two ladders, he was negligent in not taking the safer route. This is but another way of saying that libelant, in using the forward ladder, assumed part of the risk that this ladder might be defective.

■ The proof that this ladder had been in use during the day and evening in question by the stevedores and had been used by officers of the ship, and that access to it had not been barred is such

that I cannot conclude, as a matter of fact, that libelant was negligent in using that ladder. If libelant's injuries had been occasioned, in some way, by the two missing rungs, of which he had knowledge, then the situation would have been quite different. However, the undisputed testimony shows that the two missing rungs had no part in the accident, and that the accident was caused by another rung pulling out from the ladder.

I do not believe that it can be assumed that because two rungs are missing from a ladder, that it is negligent to use the balance of the ladder, particularly when the ladder had been in use and continued to be in use up to the time of the accident. I therefore conclude that the injuries received by the libelant were not contributed to by any negligence on the part of libelant.

## 2. The Issue Of Damages

The evidence showed the following as to the injuries received by libelant:

1. As a result of the fall from the ladder, libelant had a fracture of the wrist and a compression fracture of certain vertebrae.

2. He was injured on March 7, 1952. He was paid his wages to April 1, 1952.

3. He remained in the army hospital in Trieste from March 8, 1952 until March 31, 1952. He was then repatriated to the United States where he entered the United States Marine Hospital on April 2, 1952, where he remained as an in-patient until April 10, 1952, when he was discharged to out-patient status. He was readmitted to the hospital on July 31, 1952, and on August 7, 1952 was discharged as fit for light duty.

4. On October 21, 1952, libelant returned to work as a Third Mate. However, his injuries interfered with his retaining the job, and on November 21, 1952, he returned to the United States Public Health Service Hospital. On November 25, 1952, an operation was performed on his wrist. On January 2, 1953, he was discharged to out-patient care and on March 28, 1953, he was discharged as again fit for light duty.

5. On May 30, 1953, libelant again returned to sea, this time as a mess boy. His back continued to trouble him, and on December 15, 1953, he was again admitted to the United States Public Health Service Hospital where he remained until May 13, 1954, during which period of time an operation was performed for a spinal fusion.

6. The evidence indicated that a further exploratory operation was to be made late in the Summer of 1954, but that from all indications at the time of the trial, the spinal fusion had been successful. It was, however, indicated without dispute that libelant would not be able to return to work much before January, 1955.

7. Libelant is a young man—24 years of age. He had only 6 years of formal schooling. At the age of 15 years, he went to sea and thereafter had no other trade. He showed ambition, energy, and a quick adaptability to problems and rose from the position of mess boy to ordinary seaman, then to able-bodied seaman and finally to Third Mate.

8. At the time of the accident, libelant's base pay was $378.66 per month. However, evidence indicated that ships officers, when on duty, received substantial overtime pay which, it was estimated, would equal at least $200 additional per month. In the period of time that libelant worked as Third Mate on the S.S. Casimir Pulaski, the evidence indicated that his earnings were almost $800 per month. This was the second time that libelant served as Third Mate. Over the two years previous to the accident, his earnings averaged $3,600 per year.

9. The evidence indicated that employment as a seaman or ships officer is not necessarily continuous. There are periods of time in which it is difficult or impossible to find a position. In the period of years between 1945 and 1951, libelant worked only 78% of the available time. One of the witnesses at the

trial was a man who was the Chief Engineer of the S.S. Casimir Pulaski at the time of the accident. He has had a Chief Engineer's license since 1940. After leaving that ship, he worked on various other ships, with intervals of time between each job. He had last been employed on a ship on November 18, 1953, and had been unable to secure a position on a ship since that time. There seems to be little doubt but that positions for officers on American ships are not as plentiful as they were at the end of the war or during the period of the Korean war. Therefore, it cannot be assumed that the libelant, who was a young man with slight experience in the position of Third Mate, would necessarily have continued to find permanent employment as a ships officer at the rate of compensation which he was receiving at the time of the accident.

10. The Court finds from the medical testimony that libelant will have a permanent partial disability to his back and a slight permanent partial disability to his wrist. The disabilities are such that the Court finds that libelant would probably be unable to successfully secure a position as a ships officer since stooping, bending and climbing are required in the performance of the duties of such a post.

11. However, the disability will not be such that it will interfere with libelant earning his living in the type of job which will not require the stooping, bending and climbing which are essential parts of the duties of a ships officer. Libelant, however, is not trained at the present time for any other position, and it may be assumed that libelant will, for a period of years, be unable to earn as much as he would have earned if he had continued as a ships officer. The extent of this diminution of earnings is a matter which cannot be determined with mathematical certainty. It depends upon the occupation into which libelant enters. While if he had remained as a ships officer he might have advanced to higher positions, it is also true that as a young man who enters another position, he will also have opportunities for advancement with increasing years and experience. It would be a mistake to assume that because this young man has been successful in advancing from the position of ordinary seaman to a ships officer, that he could not advance in other occupations which he may enter.

Taking all of the foregoing into account, I determine libelant's damages as follows:

(a) For the period from April 1, 1952 (the date at which his salary terminated) to January 1, 1955 (the date of anticipated recovery from his operation), I compute his loss of earnings as $14,850. This assumes that during this period, he would have been employed 75% of the time at an average monthly salary of $600. During this period, however, libelant returned to sea and earned $2,161. Therefore, for loss of earnings during this period, he will be allowed $12,689.

(b) As has heretofore been stated, his loss of earnings in the future, due to the necessity of changing his type of occupation, is problematical. However, there is sufficient evidence to indicate that it will be substantial for a number of years. Likewise, libelant is entitled to compensation for his pain and suffering. For loss of future earnings and pain and suffering, I award him the sum of $50,000.[1]

---

1. If it can be assumed that for a period of 35 years libelant would earn $2,000 a year less than what he otherwise would have earned, the present value of an annuity certain of producing $2,000 a year for a period of 35 years at a rate of return of 3½% would be approximately $40,000. I do not anticipate that reduction of earnings will be constant over this period of time. I assume that it will be substantially greater at the beginning of the change of employment than it will be in later years. However, the continuity of employment in other types of industry may be greater than it would be in employment at sea; and the length of his working life may well be longer in other employments than it would be at sea.

(c) Under the terms of the Collective Bargaining Agreement in effect at the time of libelant's injuries, maintenance was payable at $8 per day during out-patient treatment periods until maximum improvement had been reached. Libelant is entitled to maintenance for a period of 350 days at $8 per day. This amounts to $2,800.

I therefore award to the libelant damages in the sum of $65,489.

Decree to enter accordingly.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Should either party desire enumerated or additional findings, these may be proposed upon notice to the other side.