**Rocco FERRIGNO, Libellant,**

v.

**OCEAN TRANSPORT LTD., Respondent,**

v.

**PITTSTON STEVEDORING CORP.,
Respondent-Impleaded.**

United States District Court
S. D. New York.

Dec. 27, 1961.

See also 188 F.Supp. 179.

DiCostanzo, Klonsky & Sergi, Brooklyn, N. Y., Benjamin J. Sergi, Brooklyn, N. Y., of counsel, for libellant.

Kirlin, Campbell & Keating, New York City, James H. Reidy, New York City, of counsel, for respondent.

Monica & Feury, New York City, Thomas H. Healey, New York City, of counsel, for respondent-impleaded.

LEVET, District Judge.

This is a maritime cause for personal injuries sustained by libellant, Rocco Ferrigno, a longshoreman, aboard the SS Myriam III on April 1, 1958. The action was originally instituted as a civil suit in this court on December 15, 1958, and on October 21, 1960, an order was issued transferring this case from the civil to the admiralty side of the calendar. The case was tried on the admiralty side of the court. The parties are, therefore, referred to as "libellant," "respondent," and "respondent-impleaded." The respondent, Ocean Transport Ltd. (hereinafter "Ocean"), which owned, operated and controlled the Myriam III, impleaded Pittston Stevedoring Corp. (hereinafter "Pittston"), employer of libellant Ferrigno.

The proposed findings of fact, conclusions of law and briefs of the parties having been received, the court, after considering the pleadings, evidence, stipulations, exhibits and briefs of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

### Findings of Fact

1. Ocean at all relevant times was and is a Liberian corporation and the owner and operator of the SS Myriam III.

2. At all relevant times and at the time of the accident to the libellant hereinafter referred to, the respondent-impleaded, Pittston, was and still is a corporation duly organized and existing under and by virtue of the laws of the State of New York.

3. The SS Myriam III was a cargo vessel carrying lumber. On April 1, 1958, the libellant, an employee of Pittston, with other Pittston employees, was aboard the said vessel for the purpose of discharging the cargo of lumber from the hold of the vessel, and in particular from the No. 3 hatch, at a dock at the foot of Green Street, Brooklyn, New York.

4. In the No. 3 hatch there was a ladder at the aft in the square of the hatch running from the main deck to the lower hold, which ladder was metal, with metal sides and rungs, being about 2 feet wide and one foot between rungs.

5. There were security ladders in said No. 3 hatch in addition to the ladders in the square of the hatch.

6. At times, at least, when the hatch is full of cargo, the longshoremen use the ladders in the square of the hatch rather than the security ladders. When there is no cargo, the longshoremen use the security ladders which are attached to the bulkhead. (Preve, SM 223, 238) The longshoremen indicated that they did not use the forward ladder in the square of the hatch because the hatch was full of cargo and there was no room of access. (Ferrigno, SM 12, 13; Cucurillo, SM 159, 160) Preve, the chief mate, indicated that the cargo covered the entire floor of the tweendeck from one bulkhead to another about 2 feet above the floor. (SM 224, 225)

7. The ladders in the square of the hatch had been subjected to previous

blows from drafts of cargo during cargo operations. (Preve, SM 238) Although the ship's officer was aware of this prior to Ferrigno's accident, neither the ship's officers nor crew members conducted any close or adequate inspection of these ladders before the accident. (Preve, SM 222, 226, 227, 232, 234, 235)

8. On March 19, 1958, the SS Myriam III was moored to the Green Street Pier, Brooklyn, New York, for the discharge of lumber cargo; Pittston employees had been aboard from March 20, 1958, but Ferrigno did not go aboard until April 1, 1958 at 8:00 A.M., at which time there was lumber cargo in the lower hold of the No. 3 hatch to be discharged.

9. Ferrigno and seven other fellow-employees (i. e., holdmen) arrived at the No. 3 hatch about 8:05 A.M. on April 1, 1958, and when they descended the aft ladder to the lower hold, Ferrigno found a ladder rung missing from about the middle of the ladder, some six or seven steps from the lower hold. (Ferrigno, SM 12, 15) However, he descended without mishap (Ferrigno, SM 15, 16) and started discharge of the cargo.

10. At about 10:30 A.M., Ferrigno, instructed by his hatch boss to obtain wooden wedges to be used in the discharge operation, ascended the same aft ladder and reached the main deck, obtained the wedges, dropped them into the hold and started his returning descent. (Ferrigno, SM 17, 18; Cucurillo, SM 159, 160) About halfway down the ladder from the tweendeck to the lower hold, Ferrigno reached the place where the rung was missing, and while he had both hands on an upper rung, he reached with one of his feet beyond the missing rung for the next step below, whereupon the rung he was holding on to came loose from the ladder and he fell six or seven feet onto the top of the cargo below. (Ferrigno, SM 19, 20; Cucurillo, SM 164–166; Preve, SM 240–246; Libellant's Ex. 2)

11. When Ferrigno went down the ladder the second time to return to the hold, he knew that one rung was missing. (Ferrigno, SM 137, 140) Thus, there is no doubt that libellant had actual notice of this defect in the hatchway ladder at the aft end of the No. 3 hatch. However, Ferrigno was not instructed by his hatch boss or anyone else to use the security ladder or not to use the hatch ladder. (Ferrigno, SM 138, 139) Ferrigno had seen other longshoremen trying to get into the housing above which led to the security ladder (Ferrigno, SM 92), but he denied that he knew about the security ladder (SM 151), and there is probably insufficient proof to show his knowledge thereof. The proximate cause of libellant's accident was the breaking loose of the rung on which libellant then had his hands.

I find that the respondent has not shown by a fair preponderance of the credible evidence that libellant was contributorily negligent either because of his knowledge of the broken rung below or because of his failure to use the security ladder.

12. By reason of the fall from the ladder on April 1, 1958, Ferrigno, the libellant, suffered certain injuries as follows: (1) Contusions and sprain of the left knee with some signs of synovitis for a limited period and from which libellant has substantially recovered; and (2) certain temporary derangement of the lower back which resulted in some restriction of use for a time and with some muscular spasm.

13. Libellant has failed to prove by a fair preponderance of the evidence that his alleged head injury and the symptoms allegedly resulting therefrom were proximately caused by his accident of April 1, 1958. (a) None of the reports of Dr. Mario F. Tagliagambe in the period from April 2, 1958 to September 8, 1958 reveal any indication that libellant complained of any injury to his head. (Ex. B) Dr. Tagliagambe also wrote that Ferrigno never made any complaints referable to the head during the entire course of treatments at his office from April 1, 1958 to August 29, 1958. (Ex. B, letter apparently dated

July 7, 1958) (b) The first recorded complaint of a head injury made by libellant is that to Dr. Graubard on September 3, 1958 (Graubard, SM 45), to whom Ferrigno was sent by his proctors. (Graubard, SM 43) Each of the three physicians to whom libellant complained of head injury found no evidence of trauma nor any objective pathology. (Ex. B, Dr. Michele's report of November 18, 1958; Dr. Balensweig, SM 187, 201; Dr. Graubard, SM 49, 106)

I do not believe libellant's testimony to the effect (1) that he reported and complained of a head injury on his second visit to Dr. Tagliagambe's office (SM 25, 26, 128) or (2) that he subsequently complained of headaches to Dr. Tagliagambe and an associate and that he received prescriptions for the alleged headaches.

14. As to the extent of libellant's injury to the left knee: Dr. Tagliagambe's X-ray examination of libellant's knee on April 1, 1958 was negative (Ex. B, report, April 2, 1958); Dr. Balensweig's X-ray examination on April 31, 1959 was also negative. (SM 183)

The objective findings of Dr. Michele's examination of November 18, 1958 with reference to the left knee consisted only of (a) some grating on rapid flexion and extension; (b) some thickening of the synovium (Ex. B, Dr. Michele's report of November 18, 1958), which indicated only mild residuals of a strain of the left knee as evidenced by a synovitis. (Dr. Balensweig, SM 185)

Dr. Tagliagambe's report of July 23, 1958 indicated that on June 30, 1958 the libellant had attained maximum benefits of medical treatment (of the knee) and after further treatments, Dr. Tagliagambe reported on September 8, 1958 that the libellant had attained maximum benefits from medical treatment and was able to work as of August 30, 1958 (Ex. B)

Dr. Kennedy, on July 8, 1958, found signs of synovitis in the left knee. (Ex. B, Dr. Kennedy's report of July 8, 1958) However, with respect to grating of the left knee noted on Dr. Michele's report, it is a normal finding in most people over the age of 20. (Dr. Balensweig, SM 196) It also appears that when examined by Dr. Balensweig, the libellant resisted and tightened his muscles (183), which sheds some doubt on the results of libellant's examination by Dr. Graubard and Dr. Michele.

Dr. Balensweig reported that the libellant had sustained a sprain of the left knee, that he had recovered from the sprain, and that he had no residual synovitis. (185) With this I agree.

15. With respect to libellant's back injury, I find as follows:

There is no believable indication that the libellant reported a back injury before his second visit to Dr. Tagliagambe's office on April 14, 1958. (See Ex. B, report of April 16, 1958) Dr. Kennedy, in his report of July 8, 1958, indicates that the libellant "withdrew" from the examiner. (Ex. B, report of July 8, 1958) Consequently, it is difficult to ascertain what was subjective and what objective in the libellant's back complaints. It appears that he voluntarily limited his trunk motion before Dr. Balensweig on August 31, 1959. (Dr. Balensweig, 181)

In any event, by July 23, 1958 and by September 8, 1958, Dr. Tagliagambe indicated that libellant had received maximum benefits from medical treatment as of August 30, 1958 and certified him as ready to work. (Ex. B reports)

16. The libellant was disabled for the period from April 1, 1958 to October 11, 1958, when he returned to work. Dr. Balensweig said libellant was disabled for 9 months. (SM 211, 212) I assume also that there was some restriction of the back, at least for a period of three to four months, and some swelling and tenderness over the knee with a limitation extending for a somewhat longer period than the back, but, withal, no permanent substantial loss of function.

The libellant was treated at Dr. Tagliagambe's office seven times in April

1958, nine times in May, ten times in June, twelve times in July and eleven times in September. (Ex. B) He returned to work on October 11, 1958.

One of the doctors prescribed a corset for libellant, which he purchased, and testified that he used it for about 4 months. (Ferrigno, SM 28–30) He used a cane for about 5 months. (SM 27) He was last treated on October 9, 1958. (SM 35) He claims that once or twice a week his back pains him (SM 33, 34), that at times he has pain in his leg (SM 32), and that he cannot bend "much." (SM 33)

I am not convinced that libellant's claims as to pain and suffering are correct and I find that he has not sustained his burden of proving substantial future pain and suffering by a fair preponderance of the credible evidence.

17. Between April 1, 1958 and October 11, 1958 (6⅓ months), the libellant lost wages which, in my opinion, amounted to $3,407. (Ex. 5)

I find that libellant has failed to prove by a fair preponderance of the evidence that his earnings have been otherwise diminished as a result of the accident either since October 11, 1958 or that his earnings will be diminished in the future as a result of this accident.

## DISCUSSION

As stated by Judge Learned Hand in Ondato v. Standard Oil Co., 2 Cir., 1954, 210 F.2d 233, 233–234:

"In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, the Supreme Court extended the ship's liability for unseaworthiness to longshoremen working on board; and in Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202 [98 L.Ed. 143], extended it still further so as to cover a mechanic who had come on board to repair the ship in port. In these cases the liability is the same as that to seamen at sea, and is measured by the same test as when the damage is to cargo: i. e., whether in hull and gear she was reasonably fit for the purposes of her voyage; and it is immaterial how much diligence may have been used, if it fails to make her so. * * *"

The libellant's use of the hatch ladder rather than the security ladder does not bar recovery, but libellant's negligence, if any, may be considered in mitigation of damages. Palermo v. Luckenbach Steamship Co. Inc., 1957, 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3, reversing 2 Cir., 246 F.2d 557. See also Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 408–409, 74 S.Ct. 202, 98 L.Ed. 143; Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265; Beadle v. Spencer, 1936, 298 U.S. 124, 56 S.Ct. 712, 80 L.Ed. 1082.

The mere fact that libellant knew of the absence of the ladder rung does not bar him from recovery by reason of his fall during the subsequent use. The fact that additional rungs gave way does not make libellant contributorily negligent. Under the circumstances, libellant's knowledge of the missing rung does not here impose contributory negligence. Hildebrand v. United States, D.C.S.D.N.Y., 1954, 134 F.Supp. 514; Dixon v. United States, 2 Cir., 1955, 219 F.2d 10, 17.

The failure of the libellant to utilize the security ladder under the circumstances does not indicate that he was contributorily negligent. The proof does not demonstrate that this was a feasible or available alternate to the use of the hatch ladder since the cargo and the nature of the entrance from the deck apparently precluded its use.

The libellant was in the position of a seaman who was ordered in effect to utilize a route which proved to be an unsafe one due to the breaking of the rung as he was descending after performance of a duty imposed by the hatch boss, here in effect a vicarious ship's officer.

Under the conditions, the libellant is neither barred from recovery nor subjected to the imposition of a holding of contributory negligence in mitigation of

damages. See Palermo v. Luckenbach Steamship Co., Inc., 1957, 355 U.S. 20, 78 S.Ct. 1, 2 L.Ed.2d 3; Dixon v. United States, 2 Cir., 1955, 219 F.2d 10.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The respondent Ocean, by its employees, had control of the vessel and its appurtenances, including the ladder and its rungs in question and was responsible for not providing the libellant with a reasonably safe place to work and a seaworthy vessel.

3. The libellant was not negligent in attempting to descend into the No. 3 hatch by means of the aft hatchway ladder which contained a missing rung, or by reason of his failure to use the security ladder, under the facts and circumstances hereunder.

4. As a result of the accident, libellant has been injured as follows:

Lost wages ................... $3,407
Pain, suffering and disability (past and future) ...... $4,000
                                      $7,407

5. The libellant is entitled to a decree against the respondent in the sum of $7,407.00 plus costs.

In addition to the preceding Findings of Fact with respect to libellant's action against respondent, the court makes the following findings of fact with respect to the third party action:

## FINDINGS OF FACT WITH RESPECT TO THE THIRD PARTY ACTION

18. On April 1, 1958, libellant was employed by Pittston, the respondent-impleaded, as a longshoreman aboard the SS Myriam III.

19. Pittston performed stevedoring operations aboard the SS Myriam III from March 20, 1958 through April 1, 1958.

20. Respondent-impleaded discharged lumber from the lower hold of the SS Myriam III during the following times on the following dates:

March 20, 1958 – 8:30 to 8:45 A. M.;
March 24, 1958 – 8:00 A. M. to noon and 1:00 to 5:00 P. M.;
March 27, 1958 – 8:00 to 9:30 A. M.;
March 28, 1958 – 8:00 A. M. to noon and 1:00 to 5:00 P. M.;
March 31, 1958 – 8:00 A. M. to 8:45 A. M.;
April 1, 1958 – 8:00 A. M. to noon and 1:00 to 5:00 P. M.

21. The length of the lumber discharged by respondent-impleaded in the No. 3 lower hold was up to 24′ long.

22. Pittston, prior to libellant's accident, had actual notice of the fact that one rung was missing from the hatchway ladder at the aft end of the No. 3 hatch from the tweendeck to the lower hold, but it did not have notice of any other defects. With knowledge of the missing rung from the hatchway ladder, it, nevertheless, permitted libellant to use the hatchway ladder.

23. There is insufficient evidence to establish that other ladders besides the aft hatch ladder were available in the No. 3 hatch on April 1, 1958. Preve's deposition was not admissible against Pittston and has not been considered by the court as against Pittston. Even if considered, it would not substantiate the availability of the security ladder under the circumstances of April 1, 1958.

24. There is insufficient evidence to warrant a finding that Pittston caused the aft ladder in the No. 3 hatch to be struck by discharging cargo on any occasion; only two drafts were discharged from the No. 3 hatch on April 1, 1958 prior to the libellant's injury. Although Pittston worked on various occasions between March 20, 1958 and April 1, 1958, there was no evidence that the aft ladder was struck by cargo being discharged.

25. The respondent Ocean has not proved by a fair preponderance of the

credible evidence that Pittston knew or should have known of any defect or defects in the hatch ladder which caused libellant's injuries.

26. The reasonable value of the legal fees and disbursements expended by respondent in defense of the action instituted and prosecuted by libellant is $2,750. (SM 266, 281; Stipulation re disbursements)

27. On or about June 18, 1957, Pittston entered into a written agreement with charterer's agent Wilford & McKay, Inc., whereby Pittston agreed to stevedore the vessels of Ocean by discharging lumber. Said contract was in full force and effect on April 1, 1958, and contained, among others, the following provisions:

"The Stevedoring Company shall be responsible for all loss and/or damage to cargo and/or property done by their employees during the progress of work, and they undertake to pay for such loss and/or damage to cargo and/or property, provided, however, that the Stevedoring Company's attention is drawn to such loss and/or damage at the time of the occurrence, and an understanding had of such loss and/or damage at the time. The Stevedoring Company, however, will not be responsible for any loss and/or damage occasioned by or through any fault of the ship, its officers, crew or equipment supplied by the ship. In this connection the Stevedoring Company carries Property Damage Insurance to the limit of $1,000,000. as per Certificate of Insurance furnished to the Steamship Company.

"The Stevedoring Company further agrees to indemnify and hold entirely harmless the charterers and Wilford & McKay, Inc. and their sub-agents against any loss sustained as a result of any claim or action whatever which may be brought by any workmen or employee of the Stevedoring Company, or any other person or persons, for loss of life or personal injury sustained during the progress of the work on or around the vessels worked under this agreement. In this connection the Stevedoring Company carried Public Liability Insurance to the limits of $150,000 for any one person and $500,000 for any one accident. The Stevedoring Company also will carry insurance against liability arising under the Workmen's Compensation Laws of the State of New York, and under the United States Longshoremen and Harbor Workers Compensation Act for full protection of the Stevedoring Company's employees in accordance with and meeting all requirements of applicable State and Federal laws, as per certificate of insurance furnished to the charterers and Wilford & McKay, Inc. and their sub-agents. The provisions of the foregoing paragraph do not apply to any vessel left to charterers on a bare-boat basis insofar as it relates to indemnification and defense." (Respondent's Ex. E)

28. On April 1, 1958, there was in force and effect a charter party signed by brokers for respondent Ocean and for Seaboard Shipping Company Ltd., which contained, among others, the following provisions:

"5. Charterers to pay cost of stevedoring including winchmen, weighing, tallying and cranage at ports of loading and discharging, also bags, bagging, separations and dunnage if required, but the Charterers shall not be in any way responsible for the acts or defaults of the Stevedores. Vessel to supply deck lashings and to give free use of any dunnage and separation cloths on board. If required, Charterers to lend deck lashings, Owners paying $500 U. S. Currency for same, and Owners privilege turning such lashings over to Charterers' Agents at port of discharge for safe return to Charterers at Van-

couver, Owners remaining responsible for cost of shipping.

"6. Charterers and Shippers not to be held responsible for improper stowage, the Stevedores, although appointed by Charterers or their Agents, being under the Captain's direction and control. Vessel to furnish winches, derricks, gins and falls, and usual gear for working cargo, and also sufficient power for driving all winches at the same time. Stevedores and Charterers shall not be responsible for any damage occurring while loading and discharging cargo by reason of any defect in Vessel's machinery or tackle or for neglect on the part of Vessel's officers or crew. Vessel to have two booms in efficient working order at each hatch capable of lifting a minimum of three tons weight and all cargo winches to be capable of being put into double gear." (Respondent's Ex. F)

29. Respondent was not a named party to the aforementioned stevedoring contract.

## DISCUSSION

■ The ordinary rule is that when there are joint tort feasors there can be no indemnity between them. Vanderlinden v. Lorentzen, 2 Cir., 1944, 139 F. 2d 995; Union Stock Yards Co. of Omaha v. Chicago &c. R. R. Co., 1905, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453. The proposition applies with equal force in admiralty non-collision cases. Mr. Justice Black in Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 1952, 342 U.S. 282, 284–285, 72 S.Ct. 277, 279, 96 L.Ed. 318, enunciated the accepted view in this area:

"Where two vessels collide due to the fault of both, it is established admiralty doctrine that the mutual wrongdoer shall share equally the damages sustained by each, as well as personal injury and property damage inflicted on innocent third parties. This maritime rule is of ancient origin and has been applied in many cases, but this Court has never expressly applied it to non-collision cases. * * *

"In the absence of legislation, courts exercising a common-law jurisdiction have generally held that they cannot on their own initiative create an enforceable right of contribution as between joint tortfeasors. * * * To some extent courts exercising jurisdiction in maritime affairs have felt freer than common-law courts in fashioning rules, and we would feel free to do so here if wholly convinced that it would best serve the ends of justice.

"We have concluded that it would be unwise to attempt to fashion new judicial rules of contribution and that the solution of this problem should await congressional action. [Citations omitted.]"

■ To this rule there is an exception in that the tortfeasor may contract for indemnity. A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., 2 Cir., 1958, 256 F.2d 227, appeal dismissed, 1958, 358 U.S. 801, 79 S.Ct. 9, 3 L.Ed.2d 49; Porello v. United States, 2 Cir. 1956, 153 F.2d 605, rev'd and remanded, American Stevedores, Inc. v. Porello, 1947, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (upon remand full indemnity granted, Porello v. United States, D.C.S.D.N.Y.1950, 94 F.Supp. 952); Muratore v. United States, D.C. S.D.N.Y.1951, 100 F.Supp. 276. In addition, the courts have evolved a doctrine that in cases where a stevedore, even in the absence of an express agreement of indemnity, contracts to perform stevedoring services for a shipowner, the relationship between the parties gives rise to an obligation in the form of an implied warranty to perform such services in a workmanlike manner. The breach of this implied warranty will result in the stevedore being liable to indemnify the shipowner for any damages the shipowner may be compelled to pay longshoremen employed by the stevedore for injuries sustained as a result of the lat-

ter's unworkmanlike performance. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. The implied warranty of workmanship has been held to cover not only the actual handling of cargo, but also all incidental equipment and appliances thereto. Weyerhaeuser S. S. Co. v. Nacirema Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491.

In the Ryan case, supra at 133–134, 76 S.Ct. at 237, the Supreme Court explained the nature of the stevedore contractor's obligation in the following terms:

"The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product. The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service. [citations omitted]"

The stevedore contractor's obligation was further amplified in Weyerhaeuser S. S. Co. v. Nacirema Co., supra at 567, 78 S.Ct. at 441:

"We believe that respondent's contractual obligation to perform its duties with reasonable safety related not only to the handling of cargo, as in Ryan, but also to the

use of equipment incidental thereto, such as the winch shelter involved here. American President Lines v. Marine Terminals Corp. [9 Cir.], 234 F.2d 753, 758; United States v. Arrow Stevedoring Co. [9 Cir.], 175 F.2d 329, 331. If in that regard respondent rendered a substandard performance which led to foreseeable liability of petitioner, the latter was entitled to indemnity absent conduct on its part sufficient to preclude recovery."

■ Exactly what conduct on the part of the shipowner will be sufficient to preclude indemnity has never been expressly stated by the Supreme Court, but it is obvious that unseaworthiness and negligence do not operate as a bar to recovery by the shipowner against the stevedoring contractor. Weyerhaeuser S. S. Co. v. Nacirema Co., supra; Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; see also American Export Lines, Inc. v. Revel, 4 Cir. 1959, 266 F.2d 82, 87.

■ The reason for this position is clear. Whatever the respective obligations of the stevedoring contractor and the shipowner to the injured longshoreman, as between themselves, the stevedore, as the warrantor of its own services, cannot use as a defense the shipowner's failure to discover and correct the stevedore's own breach of warranty. Ryan v. Pan-Atlantic S. S. Corp., supra at 134–135, 76 S.Ct. at 237–238.

The fact that the shipowner itself has supplied the defective equipment which caused injury has been held not to bar it from indemnification where the stevedore is found to have breached its implied warranty of workmanship. Weyerhaeuser S. S. Co. v. Nacirema Co., supra; Crumady v. Joachim Hendrik Fisser, supra; Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir. 1959, 266 F.2d 79, cert. denied, 1959, 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62.

■ It should be noted, however, that unlike the Ryan and Weyerhaeuser cases, supra, in the case at bar Pittston never

contracted with the shipowner, but instead, contracted with the charterer of the respondent's vessel. Nevertheless, the respondent Ocean is entitled to the benefit of the implied warranty arising from the contract of Pittston. (Ex. E) As stated in the prevailing opinion of Mr. Justice Douglas in Crumady v. Joachim Hendrik Fisser, supra at 428–429, 79 S.Ct. at 448:

"  *  *  *  The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not. That is enough to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries. Restatement, Law of Contracts, § 133. Moreover, as we said in the Ryan case, 'competency and safety of stowage are inescapable elements of the service undertaken.' 350 U.S. at page 133 [76 S.Ct. at page 237]. They are part of the stevedore's 'warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product.' Id., [350 U.S.] at [pages] 133–134 [76 S.Ct. at page 237]. See MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 [L.R.A. 1916F, 696]."

In Waterman S. S. Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169, Mr. Justice Stewart, in connection with the Crumady case, wrote:

"  *  *  *  The warranty may be breached when the stevedore's negligence does no more than call into play the vessel's unseaworthiness. Crumady v. The J. H. Fisser, 358 U.S. 423, 429 [79 S.Ct. 445, 448, 3 L.Ed.2d 413]. * * * (p. 423, 81 S.Ct. p. 201)

"  *  *  *  There we explicitly held that the stevedore's assumption of responsibility for the shipowner's damages resulting from unsafe and improper performance of the stevedoring services was unaffected by the fact that the shipowner was not the party who had hired the stevedore. * * * (p. 423, 81 S. Ct. p. 201)

*  *  *  *  *  *

"  *  *  *  The owner, no less than the ship, is the beneficiary of the stevedore's warranty of workmanlike service." (p. 425, 81 S.Ct. p. 202.)

▮ A stevedore breaches his implied warranty of workmanlike service when he either (1) creates the dangerous condition, or (2) has notice of the condition and fails to either remedy it or cause his employees to refrain from working while the condition exists. Crumady v. Joachim Hendrik Fisser, supra; Weyerhaeuser S. S. Co. v. Nacirema Co., supra; Smith v. Jugoslavenska Linijska Plovidea, 4 Cir. 1960, 278 F.2d 176; Calmar Steamship Corp. v. Nacirema Operating Co., supra.

▮ There was insufficient proof to show that Pittston created the dangerous condition and, as indicated, there was insufficient proof to indicate that Pittston had knowledge or notice of the defect or defects in the hatch ladder. There was some proof, although not completely persuasive, that other employees beside Ferrigno knew of the missing rung defect, but there was an absence of proof as to whether any such notice came to the attention of Pittston's hatch boss. In fact, the proof at no point appears to indicate that Pittston or anyone associated with it in any capacity had knowledge or was in such a position that it should have had knowledge of the other latent defect in the ladder. Circuit Judge Medina's view in Ignatyuk v. Tramp Chartering Corp., 2 Cir. 1957, 250 F.2d 198, 201, is relevant, although that case was decided before the Crumady case. He states:

"The claim of indemnity here stems from the contract. We hold that an implied warranty of workmanlike performance by a stevedore

does not place upon him a duty to discover defects in the apparatus or equipment furnished by the vessel being loaded or unloaded which are not obvious upon a cursory inspection. [Citations omitted]"

Although the missing rung was readily observable, it cannot be found that the missing rung served as notice that the ladder was defective in other respects, namely that another rung was weak and would come loose when weight was placed upon it. I have been unable to find any authorities, and the parties do not direct me to any, which place upon a stevedore a duty to discover and remedy latent defects, of which it was not informed by the shipowner or other responsible party.

The factual pattern is distinguishable from Smith v. Jugoslavenska Linijska Plovidea, 4 Cir. 1960, 278 F.2d 176. In that case, the stevedore's "safety man" observed that bolts were missing from a bolt-type ladder and did nothing to secure it, assuming it to be safe, with the result that a longshoreman was injured. In the case at bar, discovery by Pittston of the missing rung, it is assumed, would have resulted in replacement of the rung and not discovery of the weak rung which caused Ferrigno's injury. Even if it could be properly found, and such finding is not made here, that Pittston by its failure to discover and replace the missing rung breached its implied warranty of workmanlike service, there is, nevertheless, no showing that this breach caused Ferrigno's injury. Reddick v. McAllister Lighterage Line, Inc., 2 Cir. 1958, 258 F.2d 297, cert. denied, 1958, 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229.

■ I find no proof in the record demonstrating that Pittston was expressly warned by Ocean through its chief officer that all hatchway ladders which had been exposed to cargo operations were dangerous to use and that the security ladders should therefore be used, nor do I find any proof that the cargo operations conducted by Pittston did in fact damage the hatchway ladders.

Consequently, there is a lack of proof of any act or failure to act on the part of Pittston which would impose liability on the stevedore because of any implied warranty of workmanlike performance.

■ Although, under Pittston's contract with the charterer, Ocean is, as indicated above, a third-party beneficiary; Pittston is not, in the absence of an express contractual provision, required to act as an insurer against any loss sustained by Ocean. Calderola v. Cunard Steamship Company, 2 Cir. 1960, 279 F.2d 475, cert. denied, 1960, 364 U.S. 884, 81 S.Ct. 172, 5 L.Ed.2d 104.

Therefore, the remaining question is whether liability is imposed by the express agreement itself. The agreement (Ex. E) contains the following provision:

"The Stevedoring Company further agrees to indemnify and hold entirely harmless the charterers and Wilford & McKay, Inc. and their sub-agents against any loss sustained as a result of any claim or action whatever which may be brought by any workmen or employee of the Stevedoring Company, or any other person or persons, for loss of life or personal injury sustained during the progress of the work on or around the vessels worked under this agreement. In this connection the Stevedoring Company carries Public Liability Insurance to the limits of $150,000 for any one person and $500,000 for any one accident. * * *"

■ An express indemnity clause in a stevedoring contract is governed by federal law and is distinguishable from ordinary insurance contracts. A/S J. Ludwig Mowinckels Rederi v. Commercial Steve. Co., 2 Cir. 1958, 256 F.2d 227, appeal dismissed, 1959, 358 U.S. 801, 79 S.Ct. 9, 3 L.Ed.2d 49.

■ The shipowner, as indicated above, has been held to be a third-party beneficiary of a stevedoring contract and allowed indemnification when the stevedore has breached the implied warranty

 

arising from his contract. I find no reason for arriving at a different result when the stevedore's obligation is express rather than implied. The principles announced in the Crumady and Ryan cases are applicable here. The Court of Appeals for the Second Circuit in Booth Steamship Co. v. Meier & Oelhaf Co., 2 Cir. 1958, 262 F.2d 310, in an analogous situation, refused to distinguish the Ryan and Weyerhaeuser cases, supra, on the ground that they involved written rather than unwritten contracts. "The way in which that contract was arrived at or preserved is irrelevant." Id. 262 F.2d at 313.

The words of the clause are clear and unambiguous. The stevedore has not limited its liability to losses caused by its negligence. See A/S J. Ludwig Mowinckels Rederi v. Commercial Steve. Co., supra; Porello v. United States, supra.

The clause, I believe, is adequate to impose liability on Pittston, and I so conclude. Respondent Ocean is entitled to recover not only the amount paid libellant Ferrigno, but also its reasonable attorneys' fees, costs, and expenses in defending against his claim. A/S J. Ludwig Mowinckels R. v. Commercial Steve. Co., supra, 256 F.2d at 232; Shannon v. United States, 2 Cir. 1956, 235 F.2d 457, 459.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of this action.

2. The respondent Ocean is a third-party beneficiary of the stevedoring contract between respondent-impleaded Pittston and the charterer of respondent's vessel.

3. The proximate cause of libellant's injury was the weak rung on the hatchway ladder.

4. The respondent-impleaded did not breach its implied warranty of workmanlike service by permitting libellant to use the hatchway ladder since the weak rung was a latent defect and the respondent-impleaded did not have notice of this defect.

5. The respondent, as a third-party beneficiary, is entitled to indemnity pursuant to the express indemnity clause contained in the stevedoring contract.

6. The respondent is entitled to recover from the impleaded-respondent full indemnity for the amount of libellant's decree against respondent, reasonable counsel fees and disbursements fixed in the amount of $2,750.00, plus taxable costs.

Submit final decree in accordance with the provisions herein and upon notice.