**Michael SCIARRILLO, Libelant,**

**v.**

**STEAMSHIP S/S FRED CHRISTENSEN, her engines, boilers, etc., and Stener S. Mullers Rederi, A/S, Respondents,**

**and**

**John W. McGrath Corp., Respondent-Impleaded,**

**and**

**Tricerri Grain Corp., Respondent-Impleaded.**

United States District Court
S. D. New York.

June 8, 1962.

Tyson & Tyson, New York City, for libelant, John J. Robinson, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for respondent Stener S. Mullers Rederi A/S, James M. Estabrook, and Milton E. Bernhard, New York City, of counsel.

Joseph F. McGoldrick, New York City, for respondent-impleaded John W. McGrath Corp., Martin J. McHugh, New York City, of counsel.

Mendes & Mount, New York City, for respondent-impleaded Tricerri Grain Corp., Frank A. Bull, New York City, of counsel.

FEINBERG, District Judge.

Michael Sciarrillo ("Longshoreman"), a citizen and resident of New York State, has brought this action in admiralty against Stener S. Mullers Rederi A/S ("Shipowner"), a Norwegian corporation, for damages for injuries allegedly caused by Shipowner's negligence and the unseaworthiness of its ship, the S.S. Fred Christensen. Shipowner impleaded (1) John W. McGrath Corporation ("Stevedore"), a New York corporation and Longshoreman's employer on the date of the accident, and (2) Tricerri Grain Corporation ("Charterer"), a New York corporation, which had the vessel under time charter on the day Longshoreman was injured.

After trial by the Court, I find that Longshoreman is entitled to an award of $8,500 against Shipowner, and that Shipowner is not entitled to indemnification by Stevedore. Oral argument was heard on March 19, 1962. Subsequently, but before decision was rendered, the claim of Shipowner against Charterer

was discontinued with prejudice by stipulation of the parties.

The facts of the accident are not in substantial conflict. On November 7, 1957, Longshoreman came aboard the vessel while it was moored at Bush Terminal, Brooklyn.[1] After uncovering the No. 1 hatch cover on the weather deck, Longshoreman and three fellow workers descended a steel ladder to the upper tween deck where they opened the upper tween deck hatch cover and removed the beams.[2] The four men looked about for a means of descent to the lower hold where they were to begin loading cargo. They saw only a rope ladder of the type commonly called a "Jacob's ladder," made of rectangular wooden rungs about one inch square fitted in between the strands of rope sides.[3] Gundersen, the "gang header," testified that after he tested the ladder to determine if it was secured at the top, he gave the signal for the men to descend.[4] Longshoreman was the first down the ladder. While he was descending, a rung came loose, he lost his footing and fell into the hold.[5]

## I

*Longshoreman—Shipowner*

■ The evidence clearly establishes that the ladder was part of the ship's equipment, had been used by the ship's crew for painting before the vessel reached New York,[6] was defective[7] and that the defect caused Longshoreman to fall.[8] Moreover, it is clear that the existence of the defect was known to the ship's crew before the accident. The ship's second mate testified that "All of the seamen on board knew that one of the steps was loose."[9] Thus, Shipowner's employees were clearly negligent in leaving a ladder which they knew to be defective in a place where they could reasonably have expected Stevedore's employees to use it. United States Fidelity & Guaranty Co. v. United States, 152 F.2d 46 (2 Cir.1945); Ferrigno v. Ocean Transport Ltd., 201 F.Supp. 173 (S.D. N.Y.1961).

■■ It is also clear that Longshoreman was one of those persons doing the "ship's work" who is protected by the doctrine of unseaworthiness under Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), and that the defective ladder rendered the ship unseaworthy. Cannella v. Lykes Bros., 174 F.2d 794, 795 (2 Cir.) cert. denied, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526 (1949); cf. Calderola v. Cunard S.S. Co., 279 F.2d 475 (2 Cir.) cert. denied sub nom. Cunard S.S. Co. v. John T. Clark & Son, 364 U.S. 884, 81 S.Ct. 172, 5 L.Ed. 2d 104 (1960), discussed below at p. 187. Accordingly, Shipowner is liable to Longshoreman for damages both for negligence and unseaworthiness.

■ Shipowner and Stevedore both contended at trial that Longshoreman himself was negligent in not using an allegedly available permanent steel ladder instead of the rope ladder and that this contributory negligence was the sole or partial cause of the accident. The facts with regard to the availability of the steel ladder are discussed below. It is sufficient to say here that I find the steel ladder was not available; in any event, there is no proof that Longshoreman knew or should have known of the presence of the steel ladder. I further find that Longshoreman was not negligent.[10]

1. Tr. p. 7.

2. Id. at 8–9, 24, 64, 69.

3. Id. at 9–14, 65, 75; Libelant's exhibit No. 2.

4. Id. at 66–67, 70; Longshoreman also determined that the ladder was secured at the top before descending. Id. at 27.

5. Id. at 9–10, 67.

6. Id. at 94, 118.

7. Id. at 102, 197.

8. Id. at 9, 67–68.

9 Id. at 102.

10. There may also have been a desultory attempt to assert another theory of contributory negligence. Mr. Wheeler, Stevedore's expert witness, testified that when

At the trial, the parties stipulated that "if the case is decided in favor of the libelant, the award will be $8,500, net." [11] Longshoreman, then, is entitled to an award of $8,500 from Shipowner.

## II

*Shipowner—Stevedore*

■ Shipowner contends it is entitled to indemnity from Stevedore under the doctrine of Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), and the later decisions of the Supreme Court in Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L. Ed.2d 491 (1958) and Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). Ryan and Weyerhaeuser required steve-dores to indemnify shipowners on the theory that by creating unseaworthy conditions that caused injury, they had breached their implied warranty of workmanlike service. In Crumady, this principle was applied in favor of a ship-owner even though, as in the case at bar, a charterer rather than the shipowner had entered into the contract for steve-doring services.

Shipowner's theory is that Stevedore rendered a substandard performance of its contract and violated good stevedor-ing practice when it allowed its em-ployees to use the defective ladder in-stead of using an allegedly available steel ladder or calling for another ladder. By rendering this allegedly substandard per-formance, Shipowner contends, Steve-dore brought "into play" the un-seaworthy conditions which caused Longshoreman's injury. Stevedore de-nies that its performance was substand-ard. It also asserts, in any event, that Shipowner's own conduct, in allowing a defective ladder to be left where it was, was "sufficient to preclude recovery" from Stevedore. See Weyerhaeuser S.S. Co. v. Nacirema Operating Co., supra, 355 U.S. at 567, 78 S.Ct. 438.

Shipowner argues first that the long-shoremen should have used the perma-nent ship's ladder. Testimony showed that there was such a ladder, made of steel,[12] encased in a shaft which could only be entered by doors on the weather and upper tween decks and the lower hold.[13] However, Mr. Wheeler, Steve-dore's expert witness, testified that the ship's stowage plan showed that nine hundred drums of insecticide were in the lower hold of No. 1 hatch on the date of the accident,[14] and that they must have been stowed in several tiers which block-ed the shaft door in the lower hold.[15] Stevedore's terminal superintendent on the date of the accident also testified that several tiers of drums filled the entire hold and that he saw them when he was in the hold after the accident.[16] This testimony conflicts with that of the ship's second mate who testified that though he saw drums in the lower hold, he saw none in the part of the hold in which the door to the shaft was located.[17] After con-sidering all the evidence and the de-meanor and credibility of the witnesses, I find that the permanent ladder could not have been used by the longshoremen at the time Longshoreman was injured, had they wanted to use it.[18]

rope ladders are "hanging free," "the agile man" will ascend or descend by hold-ing on to one rope side of the ladder and placing his feet on the front and back of the rungs (Id. at 150); Longshoreman testified that he did not descend the ladder in this manner, but went down it holding on to each rope side with one hand (Id. at 25). I find that there was not suffi-cient evidence that Longshoreman's man-ner of descent contributed to his accident to justify a finding that it did.

11. Id. at 62, 73–74.

12. Id. at 86.

13. Id. at 86–88.

14. Id. at 152–53.

15. Id. at 154–55.

16. Id. at 182–83.

17. Id. at 101.

18. There was an effort by Shipowner to show that Stevedore was told about the steel ladder. Thus, the ship's second mate testified that, before the accident oc-curred, an unidentified longshoreman

Shipowner next claims that it was poor stevedoring practice to use a rope ladder in any event. It contends that the longshoremen should have called for another ladder when they found only the rope ladder. Shipowner's expert witness on good stevedoring practice testified that the ladder should not have been used because it was not secured at the bottom.[19] But he also testified that the chief danger in use of a rope ladder not so secured is the difficulty of obtaining an adequate toehold when the ladder is against a ship's side or another vertical flat surface.[20] This hazard in the use of the rope ladder was, however, not present at the time of the accident because the ladder was hanging down into the opening of the hatch and was not hanging alongside a wall or ship's side at all.[21] This makes it unnecessary to decide whether, if the longshoremen were using the ladder in disregard of one hazard (lack of toehold with ladder against flat surface) and an injury resulted from another hazard which Stevedore had no duty to anticipate (the loose rung), Stevedore could still be found to have breached its warranty of workmanlike service.

The second mate testified that the ladder "is a ladder for young people"[22]; e. g., agile climbers. On the other hand, Stevedore's expert was asked if the use of a rope ladder such as the one from which Longshoreman fell "would be hazardous or improper by stevedores to descend from an upper 'tween deck level into cargo loaded in the lower hold." The answer was "No. The people in the maritime industry, whether seamen or longshoremen, are experienced men in working with this type of equipment."[23] Shipowner's own expert also testified that "if a man had experience of descending a [rope] ladder, I would say O.K."[24]

Shipowner failed to show that Longshoreman, or any of the other members of his gang, was so inexperienced that it was hazardous for any of them to use the rope ladder. True, Longshoreman had only worked on the docks for "three or four months" in 1957,[25] and before that had worked for five years as a postal employee.[26] However, before his employment as a postal employee, plaintiff had been a longshoreman for ten years.[27] Shipowner offered no convincing evidence that Longshoreman was too inexperienced to have used the ladder.

In support of its contention that Stevedore should not have allowed a rope ladder to be used by its men, Shipowner introduced into evidence portions of the Maritime Safety Code, revised June 1, 1955, compiled by representatives of shipowners, operators and stevedores. The portions introduced were inconclusive on whether, at the date of the accident, it was improper practice to use a rope ladder of the sort involved in this case to gain access to a hold and, if so, whose responsibility it was to call for production of another ladder. References to allegedly pertinent regulations promulgated by the United States Department of Labor in 1960 were similarly inconclusive as to proper practice on the date of the accident.

In any event, based upon all the evidence and my conclusions as to credibility, I find that Stevedore did not breach any duty to Shipowner merely because it allowed its employees to use a

---

asked him "the way down to No. 1 hatch" (Id. at 89) and that he "showed him the main entrance," the shaft door in the forecastle head (Id. at 92). Since there was no testimony as to who had inquired of the second mate, where he was going (tween deck or lower hold), and where he went, I do not find that Stevedore was actually told about the steel ladder. Moreover, in view of the ladder's actual unavailability, notice to Stevedore was irrelevant.

19. Id. at 127, 133.
20. Id. at 130–31, 133–35.
21. Id. at 116.
22. Id. at 119.
23. Id. at 151.
24. Id. at 135.
25. Id. at 23.
26. Id. at 5, 35.
27. Id. at 4–5.

rope ladder of the type involved here. Since Shipowner failed to establish the existence of Stevedore's duty not to use a rope ladder, Stevedore could only be liable if it should have detected the defect. Here, the rule is clear. In Ignatyuk v. Tramp Chartering Corp., 250 F.2d 198, 201 (2 Cir. 1957), the Court of Appeals for this Circuit said:

> "We hold that an implied warranty of workmanlike performance by a stevedore does not place upon him a duty to discover defects in the apparatus or equipment furnished by the vessels being loaded or unloaded which are not obvious upon a cursory inspection."

Accord, Ferrigno v. Ocean Transport Ltd., 201 F.Supp. 173, 183–184 (S.D.N.Y. 1961) (stevedore not required to discover broken ladder rung); Yost v. General Electric Co., 173 F.Supp. 630 (S.D. N.Y.1959) (shipyard employees not required to test chain link by link); Pena v. A/S Dovrefjell, 176 F.Supp. 677, 680 (S.D.N.Y.1959) (stevedore not obligated to inspect dunnage loaded at foreign port).

Calderola v. Cunard S.S. Co., supra, is a convincing precedent. In that case, a longshoreman was injured when he slipped on grease on a ship's ladder which the court held rendered the vessel unseaworthy. The lower court had held the stevedore liable for an indemnity to the shipowner on the theory that stevedore had breached its implied warranty of workmanlike service. The Court of Appeals for this Circuit reversed this judgment, saying (279 F.2d at 478):

> "There was no evidence in the case before us that the stevedore or any of its employees knew of the grease on the ladder until plaintiff placed his hand on it as he climbed to the roof of the deckhouse a few minutes prior to the accident. This knowledge acquired by the plaintiff so short a time before he slipped was insufficient to put the stevedore on notice of the condition and give it an opportunity to remove the grease or to have the ship's crew do so before the accident. * * * Furthermore, the evidence tended to show that the grease could have been present on the ladder for only a short time before the accident, and thus it would be unreasonable to require the stevedore to have discovered the grease in the course of normal routine."

Weyerhaeuser S.S. Co. v. Nacirema, supra, Smith v. Jugosalvenska Linijska Plovidea, 278 F.2d 176 (4 Cir. 1960) and Lawlor v. Socony-Vacuum Oil Co., 275 F. 2d 599 (2 Cir.) cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960), cited by Shipowner in support of its claim, do not affect my determination. In Weyerhaeuser, the stevedore had actually constructed the temporary winch shelter which caused the injury to the longshoreman involved. In Smith, a stevedore's "safety man" preceded the longshoremen on board the vessel and failed to inspect thoroughly a ladder which he *realized* was not bolted in the fashion it should have been. In Lawlor, the shipyard held responsible for an indemnity to the shipowner had erected a defective ladder which caused injury to a shipyard worker. Thus, in each of these cases, affirmative duties whose existence was unquestioned were breached by the indemnitor; either, as in Smith, an acknowledged duty to inspect was improperly carried out, or, as in Weyerhaeuser and Lawlor, a defective structure was furnished by the indemnitor. Weyerhaeuser and Lawlor are plainly distinguishable here, because Shipowner and not Stevedore provided the defective ladder. Smith is also obviously distinguishable because Stevedore had no obligation to inspect the ladder in so discerning a fashion as to disclose the existence of the hidden defect which caused Longshoreman's injury.

On the basis of the evidence before me and my estimate of the credibility of the witnesses, I hold that Stevedore did not violate its warranty to perform its services in a workmanlike way. This

conclusion makes it unnecessary to decide whether Shipowner's own conduct, under Weyerhaeuser, was "sufficient to preclude recovery." Cf. McNamara v. Weichsel Dampschifffahrts AG Kiel, Germany, 293 F.2d 900 (2 Cir. 1961).

The foregoing shall constitute the Court's findings of fact and conclusions of law under Admiralty Rule 46½, 28 U.S.C. Submit decree in accordance with this opinion.