Manuel AMADOR, Appellant,

v.

A/S J. LUDWIG MOWINCKELS REDERI, Appellee.

THE RONDA.

No. 313, Docket 23323.

United States Court of Appeals Second Circuit.

Argued May 11, 1955.

Decided July 1, 1955.

Robert Klonsky, New York City, and Philip F. Di Costanzo, Brooklyn, N. Y. (Klonsky & Steinman, New York City, of counsel), for appellant.

James M. Estabrook and Haight, Gardner, Poor & Havens, New York City (Francis X. Byrn, New York City, of counsel), for appellee.

Albert P. Thill and Thomas F. Keane, Brooklyn, N. Y., for Commercial Stevedoring Co., Inc., respondent-appellee-impleaded.

Before HAND, SWAN and FRANK, Circuit Judges.

HAND, Circuit Judge.

This is an appeal from a decree in the admiralty of Judge Clancy, dismissing a libel in rem and in personam against a motor vessel and its owner, to recover for personal injuries suffered by a longshoreman during the discharge of the vessel in New York. The owner impleaded the stevedoring company which had employed the libellant, basing its claim upon an indemnity contract; but since the libellant's libel was dismissed, it was unnecessary for Judge Clancy to pass upon that claim. The libellant was a member of a stevedore gang working in a lower hold of the vessel, when a heavy coil of wire was dislodged through the carelessness of other members of the gang and fell upon him, causing him severe injuries. The libel is based upon the theory that the cargo was so stowed as to make the ship unseaworthy, and that she and her owner were liable regardless of the negligence of the stevedoring gang.

The first five findings, which we quote, eliminating one erroneous statement, state in detail what happened, and they are not clearly erroneous.

"1. In March, 1951, the S. S. Ronda, owned by respondent A/S J. Ludwig Mowinckels Rederi, took aboard at Antwerp in her No. 4 hold a cargo of steel strips. The hold was fifty-six feet long and wide, the hatch opening 32.6 feet long and twenty feet wide and the strips about twenty feet long so that approximately half of their length stowed lay immediately under the hatch coaming. The steel was stowed to a height in excess of eight feet so that it was something over the top on both sides of the 8 foot high shaft tunnel. The hold itself was 22

feet deep and above it, the tween-deck was 12 feet.

"2. The vessel proceeded to Havre and there put aboard in the No. 4 hold something in excess of two thousand coils of steel wire, each one of which weighed 159 pounds, the width of the wire being 6 inches and of the coil about 3 feet. They were laid on dunnage at the bottom of the hold and married, the first tier resting at an angle on a coil laid flat at the side of the hold with the tier above laid at an angle in the other direction so that each tier helped to secure the members of the tier beneath and that above. This process resulted in what was called a 'married' stow. Above each three tiers a layer of dunnage was laid thwartships so that there were three in all, the number of tiers being altogether about twelve. Double dunnage was laid in the wings. When the stow was completed the height of the coils was two or three feet higher than the steel and general cargo was laid on both. The top few feet of the coils was shored by vertical dunnage boards braced against the steel. General cargo, baled and bagged, was in the hold forward of the coils. It was known when the vessel was at Havre that the steel was to be delivered at New York and the wire coils afterwards at Baltimore. While the Ronda encountered generally fair weather on her voyage the sea was sometimes rough and the vessel then pitched and rolled.

"3. The Ronda arrived at New York on the 19th of March, 1951 and the next morning a gang of stevedores, employed by the Commercial Stevedoring Company, Inc., the impleaded respondent, went aboard and proceeded to discharge the cargo in the tween-deck section of No. 4 hold as well as at least some of the general cargo in the lower hold. When this was completed, the discharge of the strip steel cargo was started and proceeded during the rest of that day. The steel strips were taken out by eight men divided into two gangs of four, one of which operated on the port side and the other on the starboard. A number of the strips, approximating two and one-half tons, were taken out at a time in a sling. The sling was sent aloft on the ship's crane by the gang working on one side while the gang on the other side was preparing the next draft for discharge. The process was to lift the end of the draft under the hatch opening to a point where it was higher than the coil cargo, whereupon the rope attached to the rear end of the draft would be tightened and the whole draft swung to a position under the hatch opening, lifted and put upon the dock. No guide line or backstop was used by either gang.

"4. It is found as a fact that from the beginning of the discharge of the steel this method of the stevedores' operation caused frequent collisions between the ends of some of the drafts and the coiled wire. The assistant operating manager of the ship's agent who also was general superintendent of Commercial Stevedoring Company authorized the boss of the stevedoring gangs working in the No. 4 hold to remove so much of the coil cargo as would at any time appear necessary to facilitate the discharge. * * * None of it was removed by the stevedores who persisted in maintaining the practice we have stated.

"5. In the early afternoon of March 21, libellant, who was a member of the stevedore gang operating in No. 4 hold, while engaged in passing a loop of rope under what was intended to be a draft of the steel strips and while his back was turned to the coil cargo, was struck by one or several of some dozen coils which were dislodged and fell from the top two tiers of the stow. He was severely injured. The dislodgment of

the coils was caused by successive collisions between the ends of the drafts of steel strips as the drafts were lifted and immediately by such a collision effected by the port gang whose draft was then being carelessly removed while libellant was preparing the draft to follow."

Bentsen was the assistant general superintendent of the ship's agent in New York, and he did not examine the stow with much care. It does not appear whether what he told the gang bosses was before they had begun to discharge the steel strips in the way they did; but, although he did not warn them before he left, Lunde, the ship's second mate, saw the drafts hitting the coils and warned the gang bosses to be careful. Moreover, later, after he came back and saw the same thing happening, he again warned them and they agreed to be careful. The judge held that the stowage was proper; that there was no credible evidence that the coils had been disturbed except by being upset, when the drafts struck them. He held that "the stevedores' work was grossly negligent in the failure to use a stay or guide line during the ascent of the draft at least to a stable position suspended in the hatch opening. They were negligent as well in their general conduct in so conducting the discharge operation as to cause repeated collisions between the drafts of steel strips and the coils. So gross was their negligence that not even the repeated collisions served as warnings to take measures to avoid dislodging the stow of coils. The dunnage as it was laid served its purpose. The stow was solid and remained solid until discharged and the manner of laying the dunnage had nothing whatever to do with plaintiff's injury."

 We do not understand that the appellee denies that a ship is responsible for proper stowage, as well as for fitness in hull and gear; at any rate that is certainly the law. In the case at bar, considering the position of the strips and the port to which they were consigned, they were properly stowed, only in case the coils were moved out from under the square of the hatch before the strips were themselves discharged; or, if that was impracticable, if the coils were actually discharged at New York, and then reladed after the strips had been discharged. In short, the stowage was improper, should the strips be discharged over the tops of the coils, the pile of which inevitably got higher and higher above the strips as the strips were progressively discharged. So discharged as in fact they were, the stowage was dangerous, as appears beyond question from the testimony of Lunde, the ship's second mate, who was present while the work was going on, and twice warned the gang bosses that the strips were fouling the coils and that they must be careful.

We read Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 as definitely laying it down that longshoremen discharging a ship are in the same position vis-a-vis the ship as members of her crew; but the situation is to be distinguished from one in which the longshoremen were merely negligent in discharging a well stowed cargo. They were negligent, it is true; but that was not all. The strips being consigned to an earlier port of discharge than the coils, the way they were discharged was as much a part of the stowage, as is the proximity of perishable cargo to cargo that will injure it. The stowage was therefore only conditionally proper, and we do not see how the ship can escape liability when she allowed a stow, only conditionally proper, to be discharged without the fulfillment of the condition. The consent of Bentsen, the assistant general superintendent of the ship's agent in New York, would indeed have been enough, if the ship's duty ended with engaging a competent stevedoring company to discharge the strips; but it did not stop there. Under Seas Shipping Co. v. Sieracki, supra, the longshoremen as, pro hac vice members of the crew, were exposed to the dangers of a negligent stow as long as the condition re-

mained unfulfilled. What Lunde did was indeed quite natural in view of the contract between the ship and the longshoremen's contract; but it did not fulfill the condition. Unless we have misunderstood the doctrine, the situation as to the ship's liability is precisely as though the crew had been discharging the strips, and Lunde had not seen to it that the discharge of the strips at the earlier port had not been made in accordance with what its position in the stow demanded if its discharge was to be safe. Our decision in Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397, is not in point; it decided no more than that in spite of the defects—in that case of gear—the ship was "reasonably" fit for her service, which is the accepted test. The same is true of Freitas v. Pacific-Atlantic S. S. Co., 9 Cir., 218 F. 2d 562; incidentally a decision of the same court whose ruling was affirmed in Alaska S. S. Co. v. Petterson, 347 U. S. 396, 74 S.Ct. 601, 98 L.Ed. 798. The decree must be reversed in the main suit, and the libel remanded for a determination of the damages.

■ There remains the cross-claim of the ship against the stevedoring company, which, as we have said, Judge Clancy did not dispose of, because it became moot as soon as the libel was dismissed. After the decree was entered, the Supreme Court held that a marine insurance contract is to be construed under the law of the state where it was made, and not in accordance with any general rules of the admiralty, or of the power of Congress to regulate such contracts.[1] Perhaps the provision in the contract between the ship and the stevedoring company would fall within this ruling; we are not sure, and the question must be considered as not free from doubt. In Porello v. United States, 2 Cir., 153 F.2d 605, we had passed upon a contract of a stevedoring contractor indemnifying the United States in precisely the same words as those of Article Eleven of the contract at bar. We held the stevedore liable, but the Supreme Court reversed, American Stevedores, Inc., v. Porello, 330 U.S. 446, 457, 67 S.Ct. 847, 853, 91 L.Ed. 1011, holding that "the clause is ambiguous. Evidence might well have been taken as to the intention of the parties, but was not. It may be that the parties only meant American to indemnify the United States should the Government be held liable for damages solely caused by American's negligence. It may be that the intention was that American should fully reimburse the United States for all damages caused in any part by American's negligence. Finally, the parties may have intended that American, in case of the joint negligence of the parties, should be responsible for that proportion of the damages which its fault bore to the total fault." For these reasons it remanded the cause for hearing on testimony: i. e. to ascertain the meaning of the written contract. There seems to be no doubt that in this decision the Court was assuming that such a contract was to be decided under the admiralty law; but that was eight years before the decision in Wilburn Boat Co. v. Firemen's Fund Ins. Co., supra. If there is no difference in this regard between an indemnity contract like this and a contract of marine insurance, the state law applies, and in that event Semanchuck v. Fifth Avenue & Thirty-Seventh St. Corp., 290 N.Y. 412, 49 N.E. 2d 507, may cover this situation because the loss occurred in part from the ship's neglect to provide fit stowage, and there was no language in the indemnity contract covering losses to which the indemnitee's negligence contributed. We must confess that that issue is far from clear; and, since the District Court has never passed on the cross-claim at all, except to dismiss it as moot, it is certainly desirable, if indeed it is not jurisdictionally necessary, that we should not attempt to dispose of it. It too must therefore be dismissed, though without prejudice, and

1. Wilburn Boat Co. v. Firemen's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368.

the cross-claim must be remanded for trial.

Decree reversed; libel and cross-claim remanded for further proceedings in accordance with the foregoing.