Roosevelt LOWE, Libelant,

v.

The VESSEL MADRID, her engines, tackle, apparel, furniture and equipment, Respondent,

v.

LUCKENBACH STEAMSHIP COMPANY, Inc., a corporation, Third-Party Respondent.

No. 2096-M-Adm.

United States District Court
S. D. Florida,
Miami Division.

April 25, 1962.

Nichols, Gaither, Beckham, Colson & Spence, Miami, Fla., for libelant.

Joseph Pardo, Miami, Fla., for respondent.

Fowler, White, Gillien, Humkey & Trenam, Miami, Fla., for third-party respondent, Luckenbach Steamship.

DYER, District Judge.

This is an *in rem* action in admiralty, in which the Libelant longshoreman charged that the Respondent vessel "MADRID" was unseaworthy and was negligent in failing to furnish Libelant with a safe place to work. The Respondent vessel impleaded LUCKENBACH STEAMSHIP COMPANY, INC., as a third party Respondent, claiming breach of warranty to perform the obligations of its contract with the Respondent with reasonable safety. LOWE, the longshoreman, who was fifty one years old when the accident occurred, sustained a permanent partial injury to his back on January 8, 1960, while working in the number three hold of the vessel "MADRID" (then named the "MARIA TERESA"), which was discharging bagged sugar at the LUCKENBACH STEAMSHIP COMPANY docks in Tampa, Florida. At the time of the accident, which occurred between 1:00 and 2:00 p. m., the Libelant was employed by the LUCKENBACH STEAMSHIP COMPANY as a "puller" working in a stevedore gang.

The vessel "MADRID" arrived in Tampa from Cuba and began unloading its cargo of 100 lb. bags of sugar on January 7, 1960. The Libelant reported for work on the vessel for the first time at approximately 8:00 a. m. on January 8, 1960, and worked with his gang in the number 3 hold of the vessel from 8:00 a. m. to noon and from 1:00 p. m. to the time of his injury, which was approximately 45 minutes before the completion of the unloading of the number 3 hold that afternoon.

The number 3 hold of the vessel "MADRID" was divided longitudinally by a "keelson" or drive-shaft housing standing about 6 feet, 4 inches high. Libelant and three other pullers were working on the "in-shore" side of this keelson.

When the work began on the day in question, the number 3 hold contained 100 lb. bags of sugar stacked completely across the hold about 8 to 10 levels high or to a height of approximately five feet. The gang first unloaded the bags immediately below the hatch opening or in the "lead" down to the floor and from there proceeded to unload the remaining bags.

The bags were unloaded by means of a pallet hoisted by the vessel's winches. The pallet consisted of a flat board surface approximately 5 feet by 6 feet in dimension. The four "pullers", working in pairs, loaded the pallet with 30 bags of sugar (6 levels of 5 bags each), hooked the pallet on to the winch line, and the pallet was then lifted by the winch off the bottom of the vessel, guided by the four pullers to the "lead" and steadied and then hoisted out of the hatch.

At the time of the accident Libelant was stationed at the outside forward corner of the pallet—that is, at the corner of the pallet toward the lead and closest

to the outside skin of the vessel. Across from him on the inside forward corner was his work mate or "breaster". The two remaining pullers were on the stern corners of the pallet. The loaded pallet on this occasion jumped when lifted and began swinging while being drawn to the lead for hoisting. To escape the swinging 3,000 lb. pallet both of the two forward pullers who were between the pallet and the lead had to break and run. Puller on the inside forward corner ran along the keelson forward while Libelant turned and ran toward the side or skin of the vessel.

Libelant's injury resulted when he slipped and fell in an unusually excessive accumulation of loose sugar on the floor along the side of the vessel while trying to get out of the way of the swinging loaded pallet. The loose sugar was scattered unevenly over the floor of the hold which was covered with loose sheets of paper. The accumulation of sugar was particularly heavy along the skin of the vessel—reaching a depth of 3 inches or ankle deep. This rendered the footing underneath especially slippery and dangerous and was a material and direct cause of Libelant's slipping and falling.

The reason for the unusually heavy accumulation of sugar in the area adjacent to the skin of the vessel was:

(1) The absence in number 3 hold of approximately 50 per cent of the sweat boards which are customarily placed alongside of the vessel to keep such bagged cargo away from the skin and ribs of the vessel. The inside skin tends to produce moisture from the condensation caused by heated air around the cargo coming into contact with the metal sides which had been cooled by the water outside. The resulting condensation moistens paper bags of cargo permitting them to be easily torn. In addition, the rubbing of the bags against the ribs of the vessel during its ocean movement likewise tends to cause them to tear.

(2) Of the remaining sweat boards present on the vessel, many were broken and jagged. Bags stacked against these were broken and torn by the jagged edges.

(3) In addition to sweat boards, it is customary for sugar or bagged cargo vessels to use water-proofed paper on the floor and sides of the hold to keep out moisture. A sample of the paper used on this vessel was introduced as Libelant's exhibit number 1. Visual examination shows that it was not water proof. Additionally, along much of the vessel's side or skin there was no paper of any kind.

A method and equipment for cleaning the hold to remedy the excessive accumulation of sugar during the unloading was available to the vessel but not used. If requested by the ship owner, LUCKENBACH would have swept and cleaned the hold during the unloading for a price. LUCKENBACH was equipped to do so, but the ship owner made no such request because of the extra expense and the delay it would have encountered in discharging the cargo. It elected to make use of its own crew for this purpose, after discharging was completed and the voyage resumed. As a direct result of such unseaworthy condition and the negligence of the Respondent in not furnishing the Libelant a safe place to work, the Libelant slipped and fell as aforesaid and suffered a permanent partial injury to his back.

Since Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, there has been no question but that a ship owner is under an absolute non-delegable duty to provide a longshoreman with a seaworthy ship, that is, a vessel reasonably sufficient in all respects for the trade in which it is employed. The warranty extends not only to the vessel itself but to the stowage of its cargo. Palazzolo v. Pan-Atlantic S. S. Corp., 2 Cir., 1954, 211 F.2d 277, aff'd sub. nom. Ryan Stevedoring Co., Inc. v. Pan-Atlantic S. S. Corp., 1955, 349 U.S. 901, 75 S.Ct. 575, 99 L.Ed. 1239, aff'd on rehearing, (1956) 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Gindville v. American Hawaiian S. S. Co., 3 Cir., 1955, 224 F.2d 746; Amador v. A/S J. Ludwig

Mowinckels Rederi, 2 Cir., 1955, 224 F.2d 437, cert. den. (1955), 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791.

■■ It matters not that the defect or unseaworthy condition is caused by the stevedores or is transitory and of short duration. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, cited with approval in Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 427, 79 S. Ct. 445, 3 L.Ed.2d 413. As was said in Waterman S. S. Corp. v. Dugan and Mc-Namara, Inc., 1960, 364 U.S. 421, 424, 81 S.Ct. 200, 5 L.Ed.2d 169: "The ship and its owner are equally liable for a breach by the contractor of the owner's non-delegable duty to provide a seaworthy vessel." To like effect is Johnson Line v. Maloney, 9 Cir., 1957, 243 F.2d 293 and the rather recent case of Hagens v. Ellerman and Bucknall Steamship Company, U.S.D.C.E.D.Pa.1961, 196 F.Supp. 593.

■ From the established facts the liability of the respondent vessel to the Libelant on the basis of unseaworthiness would seem to be clear.

By the same token and as a distinct basis for liability there was a breach of duty by the Respondent vessel to furnish the Libelant with a safe place to work. When such a duty exists, that its negligent breach gives rise to liability was settled by Palazzolo, Ryan and Johnson, supra. The Respondent's contention that the Libelant may not claim a cause of action for negligence in rem, citing Osceola, 1902, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, is not sound. The Osceola case held only that a crew member may not recover for negligence and did not involve a cause of action asserted by a longshoreman. The Supreme Court in Pope and Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, distinguished the holding in the Osceola (where the Libelant was a crew member of the ship) and pointed out that the mere fact that Sieracki upheld the right of longshoremen to recover for unseaworthiness did not justify an argument that the Court thereby extinguished their long recognized right to recover in admiralty for negligence.

■ It therefore follows that the Libelant is entitled to recover from the Respondent. At the time of his injury Libelant was 51 years old, with a life expectancy at the time of trial of 21 years. His average annual earnings for the three years prior to injury amounted to approximately $3,900. As a consequence of his injury, Libelant underwent medical care and an operation to his back. He incurred hospital and doctor's bills totalling $911.23. Prior to the injury he apparently had an unstable low back with moderate pre-existing arthritis. He is able to do sedentary work and can probably lift weights up to 50 lbs. but not continuously throughout a day. The Court finds that, as a consequence of his injury, the Libelant has a 15 per cent permanent partial disability of his body as a whole. He is uneducated and has worked only at manual labor all his life. He has done no work since the date of the accident.

While there was some reference by one treating physician and an examining doctor as to the possibility of future medical treatment, it does not appear definitely at this time that such treatment will be necessary.

Consideration of his past earning capacity, the percentage of disability, and rationalizing as best as can be done the many intangible factors which must be given weight in arriving at a fair evaluation of Libelant's damages, the Court makes the following award:

| | |
|---|---|
| For medical and hospital expenses incurred | $ 911.23 |
| For loss of earnings, past and future | 15,000.00 |
| For pain and suffering, past and future, and inability to lead a normal life | 5,000.00 |
| or a total of | $20,911.23 |

There was timely filed in this cause a notice of claim of lien by Firemen's Fund Insurance Company, the employer's insurance carrier, pursuant to the United States Longshoremen's and Harbor Workers' Compensation Act, for the sum of $5,648.04, as compensation paid to Libelant, and medical expenses in the sum of $1,050.83, or a total of $6,-698.87. Therefore, out of the amount of the award to Libelant of $20,911.23, the sum of $6,698.87 must be deducted and a decree for that amount entered in favor of said Firemen's Fund Insurance Company.

Turning now to the impleading petition for indemnity, filed by Respondent, Third Party Petitioner, the vessel "MADRID" against Luckenbach, as Third Party Respondent, the latter takes the position that:

(1) Luckenbach and the vessel "MADRID" were joint tortfeasors and that therefore no relief can be granted the Third Party Petitioner. As a part of this assertion, Luckenbach, relying upon General Admiralty Rule 22, says that the impleading petition sounds in tort rather than breach of contract.

(2) At the time that the Third Party Respondent unloaded the vessel it was known as the "MARIA TERESA" and was not owned by the present claimant owner, Maritima Panamena del Caribe, S. A.; that the stevedoring contract was negotiated by the corporation then owning the "MARIA TERESA", and since the present owner was not a party to the stevedoring contract it is not entitled to indemnity for any liability which may have arisen on the part of the vessel and her then owner.

While the impleading petition alleges "primary or active fault" of Luckenbach, whereas in the area of contractual indemnity an application of the theories of "active" or "passive" as well as "primary" or "secondary" negligence is inappropriate, Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; nevertheless, the impleading petition also alleges "that by reason of the aforesaid contract and by reason of the doing of said stevedoring work aboard the S. S. 'MARIA TERESA', it was the duty of Luckenbach" etc. and further, that "Luckenbach * * * in failing to perform the duties and obligations resting upon them by reason of the doing of said stevedoring work and by reason of the contract therefor * * * your petitioner should be indemnified * * *". While this is not precision pleading, it substantially complies with the general requirements of General Admiralty Rule 22. It is further to be observed that the case was tried and submitted for decision on the claim of damages for breach of contract.

Luckenbach's reliance on Halcyon Lines v. Haenn Ship Corp., 1951, 342 U. S. 282, 72 S.Ct. 277, 96 L.Ed. 318, is misplaced. That involved a claim for contribution from a joint tortfeasor, while this is a typical case which fits the pattern alluded to by the United States Court of Appeals for the Fifth Circuit in Koninklyke Nederlandsche, etc., Royal Netherlands S. S. Co. v. Strachan Shipping Co., 301 F.2d 741, in which it said:

"In a series of recent cases, the Supreme Court has held that where a shipowner is damaged by a personal injury recovery against it, which damage was occasioned by the negligence of the stevedore in the performance of his contractual undertakings, then a contract action for breach of warranty will lie against the stevedore. See Ryan Stevedoring Co. v. Pan Atlantic S. S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. The action is not a derivative one from the basis of the suit by the injured party against the shipowner, but is based purely on damage resulting from a breach of contract."

832

In such a situation, "when the shipowner is held liable, it may in the same suit recover over against the stevedoring company on the stevedore contract in order to prevent needless multiplicity of litigation". Atlantic and Gulf Stevedores, Inc., Petitioner, v. Ellerman Lines, Ltd. and the City Line Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798. As was said in Ryan, supra, 350 U.S. at page 133, 76 S.Ct. at page 237, "the shipowner's claim here also is not a claim for contribution from a joint tortfeasor. Consequently, the considerations which led to the decision in Halcyon Lines v. Haenn Ship Corp., 342 U.S. 282, [72 S.Ct. 277, 96 L.Ed. 318] are not applicable."

■ During the course of unloading the cargo in this case, there was, on the floor of the number 3 hold, an excessive accumulation of sugar which became apparent as the work progressed. This created a dangerous condition which required Luckenbach to take corrective measures. Luckenbach's ship foremen or headers had definite instructions that, if they felt that a cargo was in a dangerous condition, they were not to work it. They had a continuing duty to inspect the condition of the cargo and stop work in case danger occurred. There is no doubt, too, that Luckenbach had the means and the equipment to have avoided the danger of an excessive accumulation of sugar in the hold, and it could have notified the ship owner of the condition and required additional payment for accomplishing the work that was necessary to avoid such a dangerous condition. For "if a condition is found which is unsafe for the professional longshoreman, as a rule the contractor can remedy it at the expense of the shipowner; * * * if the stevedoring operations are thereby delayed, the ship owner normally must pay for standby time." Hugev v. Dampskisaktieselskabet Int., U.S.D.C.S.D.Cal.1959, 170 F. Supp. 601, aff. 9 Cir., 274 F.2d 875, cert. den. 363 U.S. 803, 80 S.Ct. 1237, 4 L.Ed. 2d 1147.

The rule is succinctly stated in Ferrigno v. Ocean Transport Ltd., U.S.D.C. S.D.N.Y.1961, 201 F.Supp. 173, as follows:

"A stevedore breaches his implied warranty of workmanlike service when he either (1) creates the dangerous condition, or (2) has notice of the condition and fails to either remedy it or cause his employees to refrain from working while the condition exists."

Luckenbach, relying on the language of Weyerhaeuser that the vessel's owner is entitled to indemnity "absent conduct on its part sufficient to preclude recovery," argues that, since the ship owner did not request Luckenbach to clean the hold because the crew members would later do so in order to save money, and further, since there were insufficient sweat battens to protect the cargo from moisture and thus permit the bags to tear, this amounted to "conduct sufficient to preclude recovery."

■ The short answer to this is the conclusion in Crumady, supra, 358 U.S. at p. 429, 79 S.Ct. at p. 448, that "since the negligence of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over." Likewise, in Calmar Steamship Corp. v. Nacirema Operating Company, 4 Cir., 266 F.2d 79, 81, cert. den. 361 U.S. 816, 80 S.Ct. 56, 4 L. Ed.2d 62, the Court disposed of this point saying:

"The action over is in contract, and whether the shipowner can recover turns upon whether his actions are such as to bar the enforcement of the contract, and not upon whether he has or has not been found negligent in regard to the longshoreman."

In sum, the Court in Ferrigno, supra, 201 F.Supp. at 182, said:

"Exactly what conduct on the part of the shipowner will be sufficient to preclude indemnity has never been expressly stated by the Supreme Court, but it is obvious that unseaworthiness and negligence do not

operate as a bar to recovery by the shipowner against the stevedoring contractor. (citations omitted)

"The reason for this position is clear. Whatever the respective obligations of the stevedoring contractor and the shipowner to the injured longshoreman, as between themselves, the stevedore, as the warrantor of its own services, cannot use as a defense the shipowner's failure to discover and correct the stevedore's own breach of warranty. (citations omitted)

"The fact that the shipowner itself has supplied the defective equipment which caused injury has been held not to bar it from indemnification where the stevedore is found to have breached its implied warranty of workmanship." (citations omitted)

Luckenbach finally contends that there is no privity of contract between it and the claimant owner of the "MADRID" because at the time it unloaded the vessel it was known as the "MARIA TERESA" and was owned by another corporation.

 Broadly, the rule is that one who has been held legally liable for the personal neglect of another is entitled to indemnity from the latter, no matter whether contractual relations existed between them or not, States S. S. Co. v. Rothschild International Stevedoring Co., 9 Cir., 1953, 205 F.2d 253; 42 C.J.S. Indemnity § 21, p. 596.

 More precisely in Crumady, supra, 358 U.S. at p. 428, 79 S.Ct. at p. 448, the Court said:

"The warranty which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the *vessel* whether the vessel's owners are parties to the contract or not. That is enough to bring the *vessel* into the zone of modern law · that recognizes rights in third-party beneficiaries. Restatement, Law of Contract, § 133." (Emphasis supplied)

In the recent case of Waterman Corp. v. Dugan and McNamara, Inc., 1960, 364 U.S. 421, 423, 81 S.Ct. 200, 5 L.Ed.2d 169, the Court said:

"In the Ryan and Weyerhaeuser cases considerable emphasis was placed upon the direct contractual relationship between the shipowner and stevedore. If those decisions stood alone, it might well be thought an open question whether such contractual privity is essential to support the stevedore's duty to indemnify. But the fact is that this bridge was crossed in the Crumady case.

"There we explicitly held that the stevedore's assumption of responsibility for the shipowner's damages resulting from unsafe and improper performance of the stevedoring services was unaffected by the fact that the shipowner was not the party who had hired the stevedore.

\* \* \* \* \* \*

"The ship and its owner are equally liable for a breach by the contractor of the owner's nondelegable duty to provide a seaworthy vessel. The Osceola, 189 U.S. 158, 175 [23 S.Ct. 483, 47 L.Ed. 760]; cf. Continental Grain Co. v. [Federal] Barge FBL–585, 364 U.S. 19 [80 S.Ct. 1470, 4 L.Ed.2d 1540]. The owner, no less than the ship, is the beneficiary of the stevedore's warranty of workmanlike service."

It follows that the ship, no less than the owner, is a like beneficiary.

What has been said may serve as Findings of Fact and Conclusions of Law (Admiralty Rule 46½) upon which to predicate:

(1) A decree in favor of libelant longshoreman and against respondent "MADRID" on the libel for $20,911.23 and costs, of which $6,698.87 is to be paid to Firemen's Fund Insurance Company for compensation and medical expenses paid by it under the Longshoremen's and Harbor Workers' Compensation Act; and

(2) A decree on the impleading petition of the respondent "MADRID" against the third party respondent, Luckenbach, for damages for breach of contract in the sum of $20,911.23 and costs.

A decree will be entered accordingly.